IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| EMILIO SANCHEZ, SR. <br> FRANCISCA ACOSTA, Individually and the Representatives of the Estate of EMILIO SANCHEZ, JR., Deceased, and CHRIS GONZALES as GUARDIAN OF E.G., Minor Child, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL DEWAYNE VENNELL and THOMAS A. DAVIS, JR. DIRECTOR OF DEPARTMENT OF PUBLIC SERVICE, <br><br> Defendants. | § § § § § § § § § § § § § § § § § <br><br> NO. 2:06-CV-47 |

## MEMORANDUM OPINION

This case stems from the shooting death of Emilio Sanchez, Jr. by Michael Vennell, a trooper with the Texas Department of Public Safety. Plaintiffs have brought a claim under section 1983, alleging that the shooting violated Sanchez's constitutional rights. They have also brought claims under Texas's wrongful-death and survival statutes. The Court denies Defendants' motion for summary judgment.

I. BACKGROUND

Emilio Sanchez, Jr. stole a pickup truck in Dumas, Texas. Units with the Texas Department of Public Safety learned of this and began to pursue Sanchez. A dispatcher told the units that the pickup truck was being driven at high speeds and passing vehicles on the right shoulder. Troopers Michael Vennell and David Edwards, who were riding together, heard the information and spotted Sanchez exiting the highway. They activated their lights and siren and

began to chase him. The troopers state in affidavits that Sanchez changed directions erratically, jumped a curb, drove about 90 miles-per-hour on a street with a 40 mile-per-hour speed limit., tried to turn onto another street, lost control of the pickup truck, went through a residential fence, hit a tree stump, nearly hit a house, and slammed into a pole. Sanchez then jumped from the wrecked pickup and ran down the street. According to Trooper Vennell's affidavit, Sanchez ran with

> his right hand in front of his body, and did not move his right arm . . . . It appeared to me that the suspect was holding something in his right hand. The suspect ran very quickly, pumping his left arm vigorously, while keeping his right hand in a fixed position in front of his body . . . Because the suspect was not pumping his right arm as he ran, I suspected that he was holding a gun . . . .

According to Trooper Edwards's affidavit, Sanchez "kept his right hand in front of his body, and did not move his right arm as he ran . . . . [T]he suspect's hand was near his crotch, as if he was holding something. The suspect ran very quickly, pumping his left arm vigorously, while keeping his right hand in front of his body."

The troopers followed Sanchez down the street. It was dark, and Trooper Vennell ran with a flashlight that he shined on Sanchez intermittently. Sanchez ran in front and to the left of Trooper Vennell, whom Trooper Edwards followed. The troopers state in their affidavits that Sanchez was told to stop and put up his hands and that, after having run about 100 yards, Sanchez looked over his right shoulder, pulled his right arm away from his body, and turned his upper body toward Trooper Vennell. According to Trooper Vennell's affidavit, Sanchez's movements put Trooper Vennell "in immediate fear" for the troopers' lives because he thought that Sanchez was pulling a gun. Trooper Vennell shot Sanchez through the left side of his forehead, killing him. A picture of where this happened shows that Sanchez skidded across the pavement after being shot.

Dr. Joni McClain performed Sanchez's autopsy. She states in an affidavit that the bullet had a "slightly downward" trajectory. She states that abrasions on Sanchez's nose are "consistent with Trooper Vennell's statement that Sanchez was moving away from him while looking back toward" him when he shot. She states that the abrasions are "not consistent with being shot in a kneeling position and falling to the ground." She states that injuries to Sanchez's "hands, knees, arms, shoulders, face, and lips . . . are consistent with a fall and scraping of the skin against a surface, such as a road surface." And she states that the medical evidence comports with testimony that Sanchez was running forward while turning toward Trooper Vennell and moving his hand away from his body.

Plaintiffs have offered summary-judgment evidence that contradicts the summary-judgment evidence from Defendants. First, Trooper Edwards told Internal Affairs in an interview that Sanchez did not pose an imminent threat and that Trooper Vennell's shot surprised him because he saw Sanchez only turn. Trooper Edwards has since stated in an affidavit that the shooting was justified and that he had been under "the mistaken belief that an officer should wait to see what is in the suspects' [sic] hand before firing." Second, Trooper Vennell stated in an incident report that "I remember placing my hand on my pistol, pulling it out of the holster, and the subject kneeling to the ground." He has recanted, however:

> When I was being interviewed by an internal affairs officer he asked me to show him what I meant by seeing "the suspect kneeling on the ground after I had fired a gunshot at the suspect." When I physically demonstrated what I remembered seeing the suspect doing after I had fired my pistol the internal affairs investigator said you mean you saw the suspect spiraling towards the ground, and I realized that the phrase spiraling towards the ground was a more appropriate description of what I remembered seeing the suspect doing after I had fired by [sic] pistol at him.

William Gaut is Plaintiffs' expert. He states in an affidavit that "Sanchez was actually in a kneeling position, and facing the Trooper as first described by Trooper Vennell, when he was

fatally shot." Tests performed by the Texas Department of Public Safety suggest that Trooper Vennell held the gun some 49 to 63 inches above the ground when he shot. Sanchez was 70 inches tall, and the bullet hit him a half inch from the top of his head. According to Gaut's affidavit, this evidence and the bullet's downward trajectory establishes that Sanchez could not have been running when Trooper Vennell shot him.

Gaut did testify in a deposition that a downward trajectory does not necessarily mean that a bullet traveled down from the gun to the entry point. But he cites evidence in addition to the bullet's trajectory to support his conclusion that Sanchez knelt before being shot. He states in his affidavit that the bullet's force would have knocked Sanchez back and caused abrasions on the back of his head—not his nose as found by Dr. McClain—if he had been running. And he states that Sanchez could have been shot through the left side of the forehead only if he had turned his upper body and head 180 degrees. Sanchez could have turned that much from a stopped position, Gaut states in his affidavit, but not while running forward.

## II. DISCUSSION

Defendants have filed a motion for summary judgment seeking three things: (1) a determination that Trooper Vennell has qualified immunity from the claim brought under section 1983; (2) a determination that he has official immunity from the claims brought under Texas's wrongful-death and survival statutes; and (3) a determination that Chris Gonzales lacks standing to sue on E.G.'s behalf.

This Court may grant summary judgment if the record shows that the case has no genuine issue of material fact, and that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment has the burden to identify the parts of the pleadings and discovery on file that, together with any affidavits, show the absence

of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant carries this burden, then the burden shifts to the nonmovant to show that the Court should not grant summary judgment. *Id.* at 324-25. Rather than rest on pleaded allegations or denials, the nonmovant must set forth specific facts that show a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court reviews the facts and draws all inferences most favorable to the nonmovant. *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

A. QUALIFIED IMMUNITY

Qualified immunity shields government officials from civil liability for federal claims. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Courts use a two-part test to decide whether an official has qualified immunity. *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 621 (5th Cir. 2006). First, do the facts alleged show that the official violated the plaintiff's constitutional rights? *Mace v. City of Palestine*, 333 F.3d 621, 624 & n.7 (5th Cir. 2003). Second, were those rights clearly established at the time that the official allegedly committed the violation? *Id.* at 624. An official has qualified immunity if a court answers either question in the negative. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Plaintiffs claim that Trooper Vennell's use of deadly force violated Sanchez's constitutional right to remain free from unreasonable seizures, excessive force, and the deprivation of life without due process of law. The Court must analyze this claim under the Fourth Amendment's objective standard of reasonableness. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Under this standard, using deadly force does not violate a suspect's Fourth Amendment rights when a reasonable officer could have believed that the suspect posed a threat of serious harm to the officer or to others. *Mace*, 333 F.3d at 624-25; *see Graham*, 490 U.S. at

396. Courts determine the reasonableness of an officer's decision to use deadly force by looking at the facts and circumstances that confronted him when he acted. *Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). In making this determination, courts must remember that police officers are forced to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

Although qualified immunity poses a question of law, the Court must not draw legal conclusions "from disputed facts at the summary judgment phase." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736, 739 (5th Cir. 2000). It must deny summary judgment that Trooper Vennell has qualified immunity if the case has "underlying historical facts in dispute that are material" to resolving the question whether he acted objectively reasonable. *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir.1993); *see also Johnston v. City of Houston*, 14 F.3d 1056, 1061 (5th Cir. 1994).

Defendants have submitted summary-judgment evidence that supports a holding that Trooper Vennell acted objectively reasonably and therefore has qualified immunity. But Plaintiffs have submitted summary-judgment evidence that contradicts the evidence submitted by Defendants. The inconsistent stories from the troopers and William Gaut's affidavit reveal a material issue about Sanchez's behavior before the shooting. The trier of fact must resolve this before the Court can determine whether Trooper Vennell has qualified immunity. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) ("Based on the several diametrically opposed summary judgment affidavits before us, it is impossible to determine whether qualified immunity

stated in terms of probable cause existed. Hence, qualified immunity turns on fact issues that must be resolved by further proceedings in the trial court.").

### B. OFFICIAL IMMUNITY

Official immunity shields government officials from liability for claims brought under Texas law. *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000). The defense applies to situations in which an official performed a (1) discretionary duty (2) within the scope of his authority and (3) in good faith. *Id.* An officer acts in good faith if a reasonably prudent officer, under the same or similar circumstances, could believe that the officer's actions are necessary. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 656 (Tex. 1994). This standard of good faith derives "substantially" from qualified immunity's standard. *Id.* As such, the issue of Sanchez's behavior also prevents this Court from granting summary judgment that Trooper Vennell has official immunity.

### C. CHRIS GONZALEZ'S STANDING

Chris Gonzalez has sued on the behalf of a minor child named E.G. Although Plaintiffs have produced evidence that Sanchez fathered E.G., Defendants argue that Chris Gonzalez lacks standing because the alleged parent-child relationship fails to satisfy the Texas Family or Probate Codes. This argument has no merit. An illegitimate child may bring a wrongful-death claim even without having had a parent-child relationship under the Family or Probate Codes. *Garza v. Maverick Market, Inc.*, 768 S.W.2d 273, 275-76 (Tex. 1989). The child must prove only by clear-and-convincing evidence that the decedent was his father. *Id.* And if an illegitimate child may sue under a wrongful-death statute, then he may sue under section 1983. *Pluet v. Frasier*, 355 F.3d 381, 383-84 (5th Cir. 2004).

## III. CONCLUSION

Accordingly, the Court denies the motion for summary judgment that Defendants have qualified immunity from the claims brought under federal law, that they have official immunity from the claims brought under state law, and that Chris Gonzalez lacks standing to sue on E.G.'s behalf.

IT IS SO ORDERED

Signed this  28th  day of February 2007.

/s/ Mary Lou Robinson

**MARY LOU ROBINSON**
**UNITED STATES DISTRICT JUDGE**